# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

_____

| | |
|---|---|
| **EARL TRYON, _et al._** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )  **Civil Action No. WGC-09-329** |
| | ) |
| **AGRINOVA CORPORATION, INC.** | ) |
| | ) |
| **Defendant.** | ) |

_____)

## MEMORANDUM OPINION

Plaintiffs Earl Tryon and Jerman Stein brought this action against AgriNova Corporation, Inc. ("Defendant" or "AgriNova") seeking declaratory relief that Plaintiffs, not Defendant, own certain domestic and foreign patent applications and issued patents, alleging Defendant tortiously interfered with business relations, and seeking expenses of litigation. In its Counterclaim Defendant alleges Plaintiffs tortiously interfered with prospective business advantage, breached their fiduciary duty and failed to specifically perform a term of the agreement, _i.e.,_ assign their right, title and interest in the "invention" to Defendant. In their Amended Complaint Plaintiffs assert two additional counts: rescission and material breaches of agreement.

The parties consented to proceed before a United States Magistrate Judge for all further proceedings in the case and the entry of a final judgment. _See_ Document No. 12. The case was subsequently referred to the undersigned. _See_ Document No. 14.

Pending before the Court and ready for resolution is Plaintiff Earl Tryon's Motion for Summary Judgment on Claims and Counterclaims (Document No. 49). Defendant AgriNova filed an Opposition (Document No. 51) and Plaintiff Tryon a Reply (Document No. 53).

Defendant AgriNova moved for leave to file a surreply, which Plaintiff Tryon opposed. Defendant AgriNova's proposed surreply addresses two topics: (1) a response to Plaintiff Tryon's Reply in support of his motion for summary judgment and (2) a substitution of party. As to the first basis for the surreply the Court permits additional argument but as to the second basis the Court declines further argument.[1] Therefore, Defendant AgriNova's Motion for Leave to File a Surreply (Document No. 57) is **GRANTED IN PART & DENIED IN PART**. With the summary judgment ripe for resolution, the Court now rules pursuant to Local Rule 105.6 (D. Md. 2010).

## PRELIMINARY MATTER

Before addressing Plaintiff Tryon's motion for summary judgment, the Court must resolve a preliminary matter. By way of background, on September 3, 2010, David M. Lilenfeld of Lilenfeld PC and Richard E. Hagerty of Troutman Sanders LLP, as counsel for Plaintiffs Earl Tryon and Jerman Stein, moved to withdraw as counsel for Plaintiff Jerman Stein. According to counsel "[t]he interests of Plaintiffs Stein and Tryon may now diverge and therefore, undersigned counsel have determined that it is best not to represent both Mr. Stein and Mr. Tryon." Document No. 46 at 1. On October 1, 2010 the Court granted the unopposed motion to withdraw. *See* Document No. 47. That same day the Clerk of Court sent correspondence to Plaintiff Jerman Stein informing him that the case will proceed with him acting as his own

---

[1]   AgriNova notified the Court of a material change in circumstances, namely that Plaintiff Jerman Stein had assigned all his rights and claims to Allen Johnson. Simultaneous with filing the Motion for Leave to File a Surreply, AgriNova filed a Motion for Substitution of Party Plaintiff.

attorney (*pro se*) unless and until new counsel enters an appearance on his behalf. *See* Document No. 48. To date Plaintiff Jerman Stein remains unrepresented and thus is *pro se*.

On November 12, 2010 Defendant AgriNova filed a Motion for Substitution of Party Plaintiff Pursuant to Rule 25(c). Paragraphs 5 – 13 of the motion state,

> 5. On August 18, 2010 Jerman Stein executed a document titled "Sale and Assignment of All Claims against AgriNova Corporation to Allen Johnson" wherein he assigned to Allen Johnson, as an individual, his claims, asserted and unasserted, against AgriNova Corporation, its officers and directors specifically including all his interest and title to a monetary claim against AgriNova Corporation resulting from his assignment to AgriNova Corporation, of all of his rights to all of his [f]oreign and U.S. patents and foreign and U.S. [p]atent applications including but not limited to all those in Argentina, Brazil, Chile, Mexico, Peru and the United States.

> 6. On August 18, 2010 Jerman Stein also executed a document wherein he sold and assigned to Allen Johnson, as an individual, all of his debts/notes owed to Jerman Stein by AgriNova and all intellectual property including patents and patent applications.

> 7. By virtue of the above documents executed by Jerman Stein, Allen Johnson became the successor in interest to said rights which are the basis of claims asserted in the Complaint and Amended Complaint.

> 8. On September 3, 2010 Mr. Lilenfeld, as counsel of record for Mr. Stein, filed a Motion to Withdraw as Counsel as the result of irreconcilable differences between Mr. Tryon and Mr. Stein.

> 9. On October 1, 2010 an order was entered striking the appearance of Mr. Lilenfeld as counsel for Mr. Stein.

> 10. Allen Johnson is the President, member of the Board of Directors and a share owner of AgriNova Corporation.

> 11. As the true party in interest and the successor to all rights of Jerman Stein in the above litigation, Allen Johnson should be substituted for Jerman Stein as a Plaintiff and Counter Defendant.

12.     If Allen Johnson is substituted as a party for Jerman Stein, undersigned counsel intends to enter his appearance on behalf of Allen Johnson with the consent of AgriNova Corporation and th[is] proceeding will proceed without interruption as the result of the substitution.

13.     If Allen Johnson is substituted as Plaintiff, AgriNova intends to dismiss that portion of its Counter Claim which asserts claims against Jerman Stein.

Document No. 56 ¶¶ 5 – 13 (citations omitted).

In opposing the motion for substitution of party plaintiff, Plaintiff Earl Tryon ("Dr. Tryon") raises several arguments.  First, Dr. Tryon contends it would be a violation of the Maryland Lawyer's Rules of Professional Conduct for David Lamb to represent both AgriNova as Defendant and Allen Johnson as a Plaintiff.  Second, the proposed substitution challenges the integrity of the judicial process.  According to Dr. Tryon, AgriNova and Allen Johnson seek to frustrate Dr. Tryon's effort to pursue his claims.  If such a substitution is allowed, any trial would be unfair.  In addition Dr. Tryon asserts the documents attached to the motion for substitution of party plaintiff are unreliable and unauthenticated.  Dr. Tryon further notes there is no evidence that Jerman Stein consented to the proposed substitution.  *Id.* at 4.  For these reasons Dr. Tryon requests the Court deny AgriNova's motion for substitution of party plaintiff.

In its Reply AgriNova attaches a November 24, 2010 *Consent Substitution of Allen Johnson as Plaintiff Pursuant to Rule 25(c)*.  This consent form is signed by Jerman Stein.  The Reply further discloses, "[u]ndersigned counsel has been advised that in the event that the Court grants substitution, Allen Johnson intends to dismiss Counts II and III of the Complaint as well as Count[s] IV & V of the Amended Complaint and to remain as an interested party as to Count I of the Complaint."  Document No. 62 ¶ 2.

Federal Rule of Civil Procedure 25(c) states in pertinent part,

> If an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party.

Permitting the substitution of a party pursuant to Rule 25(c) is a discretionary determination. Although Plaintiff Jerman Stein sold, assigned and transferred to Allen Johnson all his "claims, asserted or unasserted, against AgriNova Corporation, its officers and directors, specifically including all [his] interest and title to a monetary claim against Agrinova Corporation, resulting from [his] assignment to AgriNova Corporation, of all [his] rights and title to all [his] [f]oreign and U.S. [p]atents and foreign and U.S. patent applications. . . .", Document No. 56, Ex. 1, in light of the nature of the claims as well as the fact that the transferee, Allen Johnson, is the current president, a director and a shareholder of AgriNova, *see* Pl.'s Br. Supp. Mot. Summ. J. ("Pl.'s Br."), Ex. 10 (AgriNova's Answers to Tryon's Interrogatories, No. 2), the Court finds the wisest course of action is to refuse substitution.

Allen Johnson is not a transferee whose interests are aligned with Dr. Tryon's. In fact, Allen Johnson's interests are diametrically opposed to Dr. Tryon's. When Plaintiffs Tryon and Stein initiated this litigation, their interests were aligned.

Second, Allen Johnson, who seeks to be substituted for Plaintiff Stein, is represented by David Lamb. Mr. Lamb is counsel for Defendant AgriNova. Defendant AgriNova consents to this dual representation. Allen Johnson is the President and CEO of AgriNova, and is the individual likely speaking with Mr. Lamb on behalf of Defendant AgriNova.[2] Thus if Allen

---

[2] "Allen Johnson, AgriNova Corporation" attended the depositions of Julian Heron, David M. Juday and Peter M. Tutini. *See* Opp'n Mot. Summ. J. ("Opp'n"), Exs. C – E.

Johnson is substituted as party plaintiff for Jerman Stein, Mr. Lamb's representation of Allen Johnson as a party plaintiff would not be directly adverse to Mr. Lamb's representation of Defendant AgriNova. If the motion to substitute party plaintiff is granted, Mr. Lamb's representation of Allen Johnson as a plaintiff would in fact benefit the representation of Defendant AgriNova. Nevertheless, permitting Mr. Lamb to represent a plaintiff and the defendant gives the *appearance* of being contrary to the Maryland Lawyer's Rules of Professional Conduct.

Finally the Court agrees with the sentiment expressed by Dr. Tryon. "[I]t would be impossible for Dr. Tryon to obtain a fair trial against AgriNova if he is seated side-by-side with AgriNova's President and CEO (Mr. Johnson) whose desire it is to prevent Dr. Tryon from succeeding on his claims against AgriNova." Document No. 60 at 3. Dr. Tryon and Jerman Stein filed their complaint, initiating this litigation, on February 12, 2009. Jerman Stein sold, assigned and transferred all his claims to Allen Johnson on or about August 9, 2010. By that date discovery had closed. AgriNova moved for substitution of party plaintiff on November 12, 2010. Jerman Stein did not consent to the substitution of Allen Johnson as plaintiff until November 24, 2010. *See* Document No. 62, Ex. 1. From February 12, 2009 to November 11, 2010, a period of twenty months, this litigation involved joint plaintiffs who asserted *adverse* claims against a defendant. The substitution is not necessary to resolve the pending summary judgment motion and, if permitted, would dramatically alter the disputed issues thereby denying Dr. Tryon a ruling on his claims by a detached, neutral tribunal. For all the reasons stated above, the Court **DENIES** AgriNova's Motion for Substitution of Party Plaintiff Pursuant to

Rule 25(c) (Document No. 56).  Jerman Stein remains Plaintiff of record, in a *pro se* capacity. Allen Johnson, Jerman Stein's successor-in-interest, will be bound by any judgment.

Having resolved this preliminary matter, the Court now turns its attention to Dr. Tryon's motion for summary judgment.

### BACKGROUND

Dr. Tryon is presently a professor of Biology at Chattahoochee Technical College.  He earned both his Master's degree in botany and a Ph.D. in entomology from the University of Florida.  In 1996 Dr. Tryon began a personal research quest related to an insect repelling plastic film.  Dr. Tryon was pursuing this task while working with Jerman Stein who owned pest control companies in the Carolinas.  Dr. Tryon's research led him to develop an idea, namely a plastic film with insect repellant infused within the film.

With the assistance of Jerman Stein, Dr. Tryon located a South American company to finalize Dr. Tryon's insect repelling plastic film.  The South American company developed a prototype.  Dr. Tryon tested the product over several years.  "On May 30, 2002, [Dr. Tryon and Jerman Stein] jointly filed a patent application with the United States Patent and Trademark Office to protect their invention.  The application, entitled Apparatus and Methods for Controlling Crawling Insects in Buildings and Agricultural Uses, was assigned Application No. 10/158,605 . . . ."  Compl. ¶ 12; Answer ¶ 12.

Dr. Tryon, lacking any business experience, sought assistance in marketing his invention. Dr. Tryon discussed his invention with Julian Heron, Peter Tutini and Dave Juday.  Dr. Tryon recounted these preliminary discussions.

> Q:     Is that what happened; you determined there may be some marketable value to this product?

A:      Yes.

Q:      Did you talk to Mr. Tutini about it?

A:      One of the key people I talked to early on, yes.

Q:      Did you talk to Mr. Heron about it?

A:      Yes.

Q:      What period of time did you know Mr. Heron?

A:      I've probably known him about 10 years.  It's not a direct relationship.   We used to communicate and he was very influential in helping me get a couple of grants from USDA.  He was the inside guy, so to speak.  All above board, now.  He told me how to do things and it made a big difference.

Q:      I assume that you believed he could be of assistance to you in developing the marketability of this product?

A:      I wouldn't go that far.

Q:      What did you view his role in any kind of assistance he could give in developing this product for markets?

A:      He had a legal background, which I thought could be invaluable, but more importantly my goal was to use his skills and his relationships with people to go after money so we could get this product to market and pay off debts we had.

Pl.'s Br., Ex. 2 (Tryon Dep. 22:4 – 23:12).

Dr. Tryon was skeptical about Julian Heron's and Dave Juday's participation.   What would they bring to the table to justify each receiving a 20% share of the effort to market the plastic film?  He conveyed his concerns in an e-mail to Peter Tutini on January 31, 2003.  That same day Peter Tutini replied stating in pertinent part:

Dave and Julian are going to bring in the money – I expect an investment (in stages, not all at once) of 1-2 million over the next

> year. This will fund remaining patent costs, EPA registration, manufacture of materials for testing, marketing and promotion, legal fees for licensing agreements, and paychecks for us worker bees. Dave and Julian will also be working closely with me on strategy and positioning, as well as lining up licenses. I promise, they will earn their money.

*Id.*, Ex. 9 (E-mail from Tutini to Tryon of 1/31/03).

Peter Tutini dissuaded Dr. Tryon's skepticism.

> Q:      So what brought you to Mr. Tutini? What was he going to do for you?
>
> A:      He appeared to me to be a very shrewd businessman, and he had heard me talk about this and had kind of convinced me that they could form a company and we could get lots of money in a short period of time and, "Earl, you wouldn't have these debts, so let's form a company, and I know some good people," and I knew these people and I agreed they were good people, so I said, "Let's form a company."
>
> Q:      So a company was formed?
>
> A:      Yeah.

*Id.*, Ex. 2 (Tryon Dep. 25:1 – 13).

Dr. Tryon and Jerman Stein subsequently reached an agreement with Julian Heron, Peter Tutini and Dave Juday resulting in the formation of AgriNova Corporation. Julian Heron recalled the following:

> A:      The real beginning was a meeting where Dr. Tryon, Mr. Stein, Mr. Tutini, Mr. Juday, I believe one other person who I'm not certain about but believe was Mr. Tutini's accountant, and myself were present. He might not have been there that first meeting. I don't recall, but the minutes would show it, and everybody sat down and agreed they wanted to commercialize the product and form AgriNova to do that.

> Q:      From your perspective, was it a collaborative effort by those people you mentioned at the meeting to agree to the terms?
>
> A:      Yes.  It was done at that meeting, at least I believe that was the first meeting, and it was agreed as reflected in the minutes that Mr. Stein and Dr. Tryon would contribute their patent applications, and there may have been one patent at that time in Argentina.  If it hadn't been issued, it was issued shortly thereafter.
>
> Mr. Tutini, Mr. Juday, and myself put up money, and all of that was exchanged for stock in the new company, AgriNova.

*Id.*, Ex. 11 (Heron Dep. 8:14 – 9:15).

The agreement reached between Dr. Tryon and Jerman Stein and AgriNova was not memorialized in one document.  *See id.*, Ex. 11 (Heron Dep. 51:9 – 12).  The majority of the terms of the agreement are contained in two minutes of the Board of Directors of AgriNova Corporation on March 6, 2003 and minutes of the Board of Directors of AgriNova Corporation on June 3, 2003.

A Special Meeting of the Board of Directors was held on March 6, 2003.  Present for that meeting were the members of the Board of Directors, namely, Peter Tutini, Dave Juday, Jerman Stein, Dr. Tryon and Julian Heron.  The minutes of the March 6, 2003 Special Meeting state in pertinent part:

> The Board of Directors discussed the transfer of the patent application for "Apparatus and Methods for Controlling Crawling Insects in Building[s] and Agricultural Uses" from Mr. Jerman Stein and Dr. Earl Tryon.  Upon motion duly made by Mr. Peter Tutini, seconded by Mr. Dave Juday and unanimously carried, it was
>
> RESOLVED, that the Corporation accept the transfer of the invention and patent application, "Apparatus and Methods for Controlling Crawling Insects in Building[s] and

Agricultural Uses," of Mr. Jerman Stein and Dr. Earl Tryon; and it was further

RESOLVED, that the Assignment of the said invention and patent application so presented to the meeting be annexed to the minutes thereof.

The Board then discussed the reimbursement of Mr. Stein and Dr. Earl Tryon for their expenses incurred in the development of the invention and the filing of the patent application, including Counsel fees and related expenses.

Pl.'s Br., Ex. 7 at 1; Opp'n Mot. Summ. J. ("Opp'n"), Ex. F1.

The terms of the annexed Assignment are as follows:

WHEREAS, WE Jerman O. Stein of . . . Shelby, NC 28152 and Earl H. TRYON of . . . Marietta, GA 30062-6057 have invented certain improvements in "APPARATUS AND METHODS FOR CONTROLLING CRAWLING INSECTS IN BUILDINGS AND AGRICULTURAL USES" set forth in an application for Patent of the United States filed May 30, 2002 as U.S. Serial number 10/158,605; and

WHEREAS, AGRINOVA CORPORATION, a corporation organized under the laws of the State of Maryland and having a place of business at 12220 Maycheck Lane, Bowie, MD 20715 (hereinafter "Assignee") is desirous of acquiring an interest therein;

NOW THEREFORE, for and in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, WE, Jerman O. STEIN and Earl H. TRYON by these presents do sell, assign and transfer unto said Assignee, its successors, legal representatives, heirs and assigns, the full and exclusive right, title and interest in the United States of America to said application, to all Letters Patents in the United States which may be granted on said application, to all divisions, continuations and continuations-in-part of said application, or reissues or extensions of said Patent, all applications for Patent and all Patents therefor, to be held and enjoyed by said Assignee, for its use and be[nefit] and for its legal representatives, successors, heirs, and assigns, to the full end of the term for which said Patents are granted and any extensions thereof, as fully and entirely as the same would have been held by ourselves had this assignment and sale not been made; and for

the same consideration, we hereby covenant and agree that, at the time of execution and delivery of this instrument, we hold good and full right and lawful authority to sell and convey the application for Patent above mentioned in the manner herein set forth; and for the same consideration we hereby covenant and agree that we will, whenever counsel of said Assignee, or the counsel of its successors, legal representatives, heirs or assigns, shall advise that any proceeding in connection with said application for Patent, or any proceeding in connection with Patent in the United States, including interference proceedings, is lawful and desirable, or that any division, continuation or continuation-in-part of any application for Patent, or any reissue or extension of any Patent to be obtained thereon, is lawful and desirable, sign all papers and documents, take all lawful oaths, and do all acts necessary or required to be done for the procurement, maintenance, enforcement and defense of said Patent, without charge to ourselves, our successors, legal representatives, heirs and assigns, but at the cost and expense of said Assignee, its successors, legal representatives, heirs and assigns; and we hereby request the Commissioner of Patents to issue said Patent to said Assignee.

Compl., Ex. A.         Jerman Stein and Dr. Tryon each signed the Assignment.   It is dated March 6, 2003.

After the Special Meeting, an Initial Meeting of the Board of Directors of AgriNova Corporation was convened on March 6, 2003.  At this initial meeting Peter Tutini was elected Chairman of the Board, President and CEO of AgriNova Corporation.  Dr. Tryon, Jerman Stein and Dave Juday were each elected as Vice-President, Julian Heron as Secretary and Tyrone Wilson as Treasurer.  The minutes of this initial meeting outline the distribution of shares of AgriNova.

The Chairman determined to issuance of 500 shares of AgriNova Corporation in consideration for the payment of $1,000 to the Corporation to Mr. Peter Tutini dated March 6, 2003.   The Chairman determined to issuance of 500 shares of AgriNova Corporation in consideration for the payment of $1,000 to the Corporation to Mr. Dave Juday, dated March 6, 2003.   The

> Chairman determined to issuance of 500 shares of AgriNova Corporation in consideration for the payment of $1,000 to the Corporation to Julian Heron, dated March 6, 2003. The Chairman determined to issuance of 500 shares of AgriNova Corporation in consideration for the value of the transfer of the pending patent application, which satisfied the bylaw requirement that stock be fully paid before being issued, to Mr. Jerman Stein, dated March 6, 2003. The Chairman determined to issuance of 500 shares of AgriNova Corporation in consideration for the value of the transfer of the pending patent application, which satisfied the bylaw requirement that stock be fully paid before being issued, to Dr. Earl Tryon, dated March 6, 2003.

Pl.'s Br., Ex. 7 at 4; Opp'n, Ex. F2 at 3.

A Special Meeting of the Board of Directors of AgriNova Corporation was convened on June 3, 2003. Dr. Tryon, Jerman Stein, Peter Tutini, Dave Juday and Julian Heron were in attendance. The minutes from this June 3, 2003 Special Meeting contain additional terms of the agreement. The minutes state in pertinent part:

> A report was given as to the status of various pending and issued patents. The transfer of the pending application for the U.S. patent has been accomplished. Counsel has been asked to transfer the issued patents to AgriNova.

> The Chairman reported on the amounts agreed to by Mr. Jerman Stein and Dr. Earl Tryon. Mr. Dave Juday moved that a Note in the amount of $20,000 due one year after issuance be issued to Dr. Earl Tryon. Mr. Juday further moved that a Note in the amount of $99,200 due one year after issuance be issued to Mr. Jerman Stein. Mr. Juday further moved that a Note in the amount of $100,000 due two years after issuance be issued to Mr. Jerman Stein. The motion was seconded by Mr. Heron and passed unanimously. Mr. Stein and Dr. Tryon did not vote.

> The Chairman presented a financial statement which is attached to these minutes for review. He further discussed outstanding bills that are owed by the corporation. These included the following:

> *       Center for Urban and Structural Entomology - $2,500

     \*      Patent Counsel - $19,000
     \*      EPA Counsel - $4,500

     He reported that the Corporation bank account has a balance of $2,047.60.

Pl.'s Br., Ex. 12 at 1; Opp'n, Ex. F3 at 1.

The minutes further reflect what actions members of the Board of Directors would take on behalf of AgriNova.

     It was determined that Mr. Jerman Stein would pursue marketing our plastic product in Chile, Ecuador and Mexico. Mr. Dave Juday will make similar efforts in Uruguay.

     Dr. Earl Tryon reported on his conversation with the President of Dole's Central American Operations and their chief technical person. It was determined that before proceeding with Dole, we would obtain a confidentiality agreement. It was agreed that we would prepare samples for their use according to their specifications. It was decided that we would not provide a "master batch" of our product to Dole or any other company under any circumstances. It was then agreed that we would negotiate with Dole on the terms of testing our product.

Pl.'s Br., Ex. 12 at 2; Opp'n, Ex. F3 at 2.

The pace of raising capital, formulating a business plan and marketing the invention did not proceed as Dr. Tryon had envisioned. Dr. Tryon nonetheless continued to work to help market AgriNova's product. An opportunity arose for Dr. Tryon to speak at a Small Business Administration ("SBA") conference. Dr. Tryon planned to speak to prospective investors on behalf of AgriNova's insect repelling plastic film or *Flora-Film*.[3] He ultimately gave that presentation but not on AgriNova's behalf.

---

[3] AgriNova adopted this name for the product during a Special Meeting of the Board of Directors on April 7, 2004. Opp'n, Ex. F6 at 2.

Q:      How frequently did you participate in presentations to investors?

A:      I did two presentations.

\*                              \*                              \*

Q:      In these two presentations, were you the presenter or were others the presenters?

A:      I presented.  I presented my talk.

Q:      And who did you present that to?  Was it a group or an individual?  What was it?

A:      One was to the Plastic Culture of the United States, it's a plastic association, and the other was to an SBA yearly presentation in front of investors.

Q:      Who did you tell them you were?

A:      Well, the one at Plastic Culture I was AgriNova and it was all AgriNova.

Q:      Did you tell them you were an officer or a director?

A:      I think it was listed at the end.  It wasn't important to me, though.  I was selling them on the concept of plastic, hoping we could find potential investors.

Q:      And then the SBA you said?

A:      Uh-huh.

Q:      And you represented to them to be who?

A:      I represented myself as IIMS.  I had to form my own company to legally make a presentation there.  I couldn't do it with AgriNova.

Q:      You said that earlier.  Why couldn't you have done it through AgriNova?

A:　　　They had a form that had to be signed prior to my presentation, and I was told by two people at AgriNova they would never sign this, and I had spent nine months being selected.  From among about 200 people that applied, they had five presenters.  I felt this was a very hot topic, so I immediately called my sister-in-law, who used to work with SBA, and she said, "Well, why don't you just form your own company right now and then you can make the presentation."

Q:　　　This was like in '05?

A:　　　Yeah, something like that.

Pl.'s Br., Ex. 2 (Tryon Dep. 89:11 – 13, 19 – 91:13).

Meanwhile there arose a disagreement about who owned the foreign patents.  Jerman Stein and Dr. Tryon took the position that the rights to the foreign patents were *never* assigned to AgriNova.  Contrarily, AgriNova believed *all* rights to *Flora-Film*, but domestic and foreign, had been assigned by Dr. Tryon and Jerman Stein to AgriNova.

On July 21, 2005 Dr. Tryon sent an e-mail to Jerman Stein inquiring, "I signed an agreement to give AgriNova rights to our patent.  Did you sign that agreement giving AgriNova your rights?  Do they have rights to our patent in South America????"  *Id.*, Ex. 17 (E-mail from Tryon to Stein of 7/21/05).  The following day Jerman Stein sent a reply stating in the first sentence, "I did not and will not sign my rights to South America on any venture with AgriNova."  *Id.*, Ex. 17 (E-mail from Stein to Tryon of 7/22/05) (all capital letters removed).  Nine days before this e-mail exchange between Dr. Tryon and Jerman Stein, Dr. Tryon sent an e-mail to Dave Juday inquiring, "do you know the five countries we have approved patents in South America???"  *Id.*, Ex. 18 (E-mail from Tryon to Juday of 7/12/05).  That same day, Dave Juday responded, "No.  And I'm not sure 'we' – i.e. AgriNova – have approved patents, I think Jerman owns them.  Never really got that straight."  *Id.*, Ex. 18 (E-mail from Juday to Tryon of 7/12/05).

On July 24, 2007 United States Patent No. 7,247,311 (the "311 Patent") was issued for the "Apparatus and Methods for Controlling Insects in Buildings and Agricultural Uses", *i.e.*, *Flora-Film*. *See id.*, Ex. 4 at 1, Ex. 8. Consistent with the agreement and as reflected in Minutes of the Special Meeting of the Board of Directors of AgriNova on March 6, 2003, the patent was assigned to AgriNova.

Although Dr. Tryon continued to work on behalf of AgriNova to market *Flora-Film*, he ultimately terminated his relationship with the corporation.

> Q:    Did you continue to try to help market the product through AgriNova through '05?
>
> A:    Yes.
>
> Q:    Did you continue to try to market it through '06?
>
> A:    Up until about six months before I left the board, I continued to help try to get AgriNova investors, yes.
>
> Q:    You left the board in '08?
>
> A:    Late '08, I think. I don't remember exactly.

*Id.*, Ex. 2 (Tryon Dep. 95:1 – 11).

Ultimately frustrated with AgriNova, Dr. Tryon initiated this lawsuit.

> A:    I don't have a money figure in my head. I have a willingness, a want to be a contractor working on this. I would like to see AgriNova or somebody come up with a plan to do this so I could work with research universities and market this, and that had been my sole goal until a couple years ago I just realized AgriNova was more interested in fighting than succeeding.
>
> Q:    You're the one who sued.
>
> A:    Well, you forced me.
>
> Q:    How is it forced?

> A:     Because AgriNova was doing nothing. I wanted to get stuff out on the table, see if we couldn't get things done, moved forward. I mean, after you have had six years of zero, quite honestly, three years ago we were 90 days from an EPA registration. Today we're three years away.

*Id.*, Ex. 2 (Tryon Dep. 205:12 – 206:6).

## JURISDICTION AND VENUE

"[I]t is elementary that a federal court may properly exercise jurisdiction in a declaratory judgment proceeding when three essentials are met: (1) the complaint alleges an 'actual controversy' between the parties 'of sufficient immediacy and reality to warrant issuance of a declaratory judgment;' (2) the court possesses an independent basis for jurisdiction over the parties (e.g., federal question or diversity jurisdiction); and (3) the court does not abuse its discretion in its exercise of jurisdiction." *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 592 (4th Cir. 2004) (citations omitted). There is an actual controversy between Dr. Tryon and AgriNova regarding who owns *Flora-Film's* domestic and foreign patent applications and issued patents. This controversy is best summarized by Julian Heron's deposition testimony.

> [I]t was not possible to raise additional capital because the efforts of Dr. Tryon and Mr. Stein were such that no investor would invest money in a company whose primary asset was contested, and so their activities totally stopped AgriNova from being able to raise any additional money because, just speaking for myself, I was not willing to tell investors that we had these wonderful patents when it was contested[.]

Opp'n, Ex. C (Heron Dep. 66:10 – 19).

There is an independent basis for jurisdiction over the parties. Subject matter jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332. Dr. Tryon is a

resident of the State of Georgia. Jerman Stein is a resident of the country of Chile. During the events giving rise to this litigation, Jerman Stein resided in the State of North Carolina. AgriNova Corporation is organized under the laws of the State of Maryland, with its principal office in Baltimore, Maryland.[4] The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

Pursuant to 28 U.S.C. § 1391 venue is proper in this district because a substantial part of the events giving rise to the claim occurred in this district. Venue is also proper in this district because Defendant's principal office is in this district.

The Court finds it has not and will not abuse its discretion by exercising jurisdiction in this case.

## STANDARD OF REVIEW

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir.

---

[4] According to the Maryland Department of Assessments and Taxation's website as of January 28, 2011, AgriNova Corporation is not in good standing, its status has been *revived* and its principal office is located at 351 West Camden Street, Baltimore, Maryland 21201. However when answering Dr. Tryon's and Mr. Stein's Complaint, AgriNova admitted that it was "a corporation organized under the laws of the State of Maryland which had a principal place of business at 12220 Maycheck Lane, Bowie, Maryland 20715." Compl. ¶ 5. As to the second sentence of Paragraph 5 AgriNova responded as follows: "Defendant admits that its charter was forfeited administratively by the Department of Assessments and Taxation but states that the charter has been or is being reinstated." Answer ¶ 5.

1950).  The moving party bears the burden of showing that there is no genuine issue as to any material fact.  Fed. R. Civ. P. 56(c); *Pulliam Inv. Co.*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial."  *Celotex Corp.*, 477 U.S. at 323.

On those issues where the nonmoving party will have the burden of proof, it is that party's responsibility to confront the motion for summary judgment with an affidavit or other similar evidence.  *Anderson*, 477 U.S. at 256.  However, "'[a] mere scintilla of evidence is not enough to create a fact issue.'"  *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984) (quoting *Seago v. North Carolina Theaters, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967), *cert. denied*, 390 U.S. 959 (1968)).  There must be "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

## DISCUSSION

A.      *Admitting Allegations by Failing to Timely Deny Them*

Before addressing disputes as to any material fact, the Court must first resolve whether, as Dr. Tryon claims, AgriNova has admitted various factual allegations contained in Dr. Tryon's

Amended Complaint by failing to deny those allegations in a timely manner. By way of background on May 13, 2009 Plaintiffs Tryon and Stein filed an Amended Complaint. *See* Document No. 13. Two days later, Plaintiffs filed a Jury Trial Demand. *See* Document No. 16. On May 26, 2009 Plaintiffs filed a Consent Motion for Leave to File Amended Answer to Counterclaim. *See* Document No. 18. The Court granted the motion that same day. *See* Document No. 19. The Amended Answer to the Counterclaim was docketed on May 28, 2009. *See* Document No. 20.

On July 31, 2009 Plaintiffs moved for entry of default for want of answer or other defense. *See* Document No. 21. Later, that same day, Defendant filed its Answer to the Amended Complaint. *See* Document No. 23.

On September 21, 2009 the Court denied Plaintiffs' motion for entry of default. *See* Document No. 27. The Court acknowledged the untimeliness of Defendant's Answer — 64 days — is egregious. Defendant promptly filed its Answer after Plaintiffs filed their motion for entry of default. The Court denied Plaintiffs' motion for the following reasons:

> Courts have a preference to hear cases based on the merits rather than dismiss cases based on procedural failings. In the Fourth Circuit default judgments are generally disfavored. *Tazco, Inc. v. Dir., OWCP*, 895 F.2d 949, 950 (4th Cir. 1990). Despite such disfavor the entry of default or a default judgment may be appropriate where there is prejudice. In this case Plaintiffs have not demonstrated any prejudice by Defendant's significantly belated filing. Plaintiffs filed their Complaint on February 12, 2009. Per the August 11, 2009 Amended Scheduling Order (Document No. 25), discovery closes December 10, 2009 and the dispositive pretrial motions deadline is January 11, 2010. Because the case is less than a year old, the Court is amenable to extending discovery if the parties so desire. Noting that Defendant's significantly belated filing does not appear to prejudice Plaintiffs and considering this Court's preference to

> enter a judgment based on the merits, the Court finds an entry of
> default is not warranted.

Order of September 21, 2009 (Document No. 27 at 4).

Dr. Tryon asserts, although the Court denied the motion for entry of default, AgriNova has admitted certain factual allegations in Plaintiffs' Amended Complaint pursuant to Federal Rule of Civil Procedure 8(b)(6).  This rule states in pertinent part, "An allegation — other than one relating to the amount of damages — is admitted if a responsive pleading is required and the allegation is not denied."  Dr. Tryon contends AgriNova did not timely deny the allegations in the Amended Complaint.  Further, when AgriNova filed its belated Answer to the Amended Complaint *after* Plaintiffs filed their motion for entry of default, AgriNova did not request permission or seek leave to file its Answer out of time.  Thus Rule 8(b)(6) dictates that AgriNova has admitted the following factual allegations:

> 1.  AgriNova was obligated but failed to pay the required consideration in exchange for the assignments alleged by Defendant (Amended Complaint, ¶ 43 [Doc. 13]);
>
> 2.  AgriNova was obligated but failed to implement a marketing plan (id.);
>
> 3.  AgirNova was obligated but failed to implement a distribution plan (id.);
>
> 4.  AgriNova was obligated but failed to provide necessary capital (id.);
>
> 5.  AgriNova was obligated but failed to take any action to commercialize Plaintiffs' invention (id.);
>
> 6.  Dr. Tryon offered to return to Defendant whatever consideration he received from Defendant (Amended Complaint, ¶ 45 [Doc. 13]);

7. Defendant's breaches are material, substantial and "tend to defeat the object of any agreement between the parties" (Amended Complaint, ¶ 46 [Doc. 13]); and

8. rescission is proper (Amended Complaint, ¶¶ 46 and 47 [Doc. 13])[.]

Pl.'s Br. at 9-10.

In its Opposition AgriNova denies that it admitted the allegations in the Amended Complaint because it filed its Answer late. Plaintiffs did not move to strike the belatedly filed Answer. Hence "the Answer remains filed and the allegations of the Amended Complaint have been denied as a matter of record." Opp'n at 2. Even if a motion to strike was filed, AgriNova asserts this Court probably would have denied the motion because courts prefer to resolve disputes by deciding cases on the merits, rather than deciding cases on grounds of procedural non-compliance.

In his Reply Dr. Tryon rejects AgriNova's contention that Dr. Tryon was required to file a motion to strike AgriNova's Answer to the Amended Complaint. Dr. Tryon notes AgriNova fails to cite any authority for such a proposition. According to Dr. Tryon, by operation of Rules 8(b)(6) and 12(a)(1)(A), AgriNova did not deny the Amended Complaint and thus the factual allegations are deemed admitted.

Once the answer date passed and AgriNova had not obtained (let alone sought) leave to answer late, AgriNova was not in compliance with Rule 12. At that point, Rule 8(b)(6) became operative. Rule 8(b)(6) states that "[a]n allegation — other than one relating to the amount of damages — is admitted if a responsive pleading is required and the allegation is not denied."

It is undisputed that AgriNova's attempt at an answer was late. (Order, p.3 [Doc. 27]). AgriNova had until May 28 to deny the allegations in the Amended Complaint but did not answer

until July 31. (Order, p. 3 [Doc. 27]). So, as of May 29 – which was the day after AgriNova's denials were due – the allegations in the Amended Complaint were admitted by operation of Rule 8(b)(6). AgriNova has presented no law to the contrary or law which would justify ignoring the operation of Rules 8 and 12.

Doc. No. 53 at 3. Moreover, Dr. Tryon contends the decision by the Court to deny the motion for entry of default pursuant to Rule 55 does not prevent the operation and thus application of Rules 8(b)(6) and 12(a)(1)(A).

In its Surreply AgriNova rejects Dr. Tryon's broad legal assertion that, despite the Court denying Plaintiffs' motion for entry of default, the fact that AgriNova untimely filed an Answer to the Amended Complaint results in admissions by AgriNova to the factual allegations. AgriNova further rejects Dr. Tryon's efforts to use the belatedly filed Answer to the Amended Complaint to support his summary judgment motion.

Rather than object to the answer that was filed, counsel waited until the filing of his Motion for Summary Judgment to use the timeliness issue of the answer as a justification for granting summary judgment based on the failure to timely deny allegations of fact in the Amended Complaint. Not only is there no law to support such, it would fly in the face of court rulings that cases should be decided on their merits.

Document No. 57-1 at 2-3. Additionally, AgriNova notes the case law cited by Dr. Tryon does not support Dr. Tryon's asserted legal proposition and/or the factual circumstances are different from the posture of this case.

The Court finds as unpersuasive Dr. Tryon's arguments that AgriNova has admitted factual allegations asserted in the Amended Complaint due to AgriNova's belatedly filed Answer. Dr. Tryon is correct that, the day after the deadline for AgriNova's Answer to the Amended Complaint had elapsed, by operation of Rule 8(b)(6) and in light of the requirement

of Rule 12(a)(1)(A), the allegations were deemed admitted because AgriNova had not filed an Answer. Plaintiffs sought entry of default pursuant to Rule 55(a) for AgriNova's failure to defend (answering the Amended Complaint) which this Court denied. Dr. Tryon now seeks judgment on some counts based on AgriNova's belated Answer, no different from Plaintiffs earlier seeking an entry of default based on AgriNova's failure to file a responsive pleading. Although AgriNova belatedly filed an Answer to the Amended Complaint, AgriNova has otherwise been fully engaged in this litigation. The rationale for denying Plaintiffs' motion for entry of default — deciding a case on the merits rather than a procedural non-compliance especially where no prejudice has been shown — applies with equal force to Dr. Tryon's assertion that AgriNova's belated Answer and failure to request leave to file a belated Answer constitute admissions of factual allegations in the Amended Complaint. The Court therefore does not find AgriNova has admitted allegations in the Amended Complaint. The Court now turns to the merits of Dr. Tryon's motion for summary judgment.

B.    *Declaratory Judgment: Whether Foreign Patent Applications & Patents Were Assigned*

Dr. Tryon contends he is entitled to summary judgment on Count I of the Complaint, namely, a declaratory judgment that the foreign patent applications and patents were never assigned to AgriNova. Dr. Tryon notes no document shows that Dr. Tryon and Jerman Stein assigned the foreign applications and patents to AgriNova. According to Dr. Tryon the parties agree that the March 6, 2003 and June 3, 2003 minutes contain the majority of the terms of the assignment between Plaintiffs and AgriNova. Dr. Tryon further cites a May 6, 2003 e-mail by Julian Heron notifying other Directors of AgriNova that the March 6, 2003 Assignment from Dr. Tryon and Jerman Stein to AgriNova concerned the United States patent only.

In its Opposition AgriNova asserts the March 6, 2003 Assignment is subject to multiple interpretations. Although conceding that the Assignment includes language about the pending United States patent application, AgriNova notes the Assignment also makes reference to "all applications for Patent and all Patents therefor[]." Opp'n at 7. Second, the minutes of the March 6, 2003 meeting reflect that AgriNova was accepting transfer of the invention and the patent application. Third, in addition to the March 6, 2003 and June 3, 2003 minutes, subsequent meetings' minutes show the foreign patents were also intended to be part of the Assignment. AgriNova cites to the minutes of August 8, 2003, April 7, 2004 and June 2, 2004. "Whether there was an effective assignment of foreign rights is a disputed fact requiring a denial of the request for judgment." *Id.* at 9.

In his Reply Dr. Tryon notes the March 6, 2003 and June 3, 2003 minutes refer to a patent in the singular. Second, in response to AgriNova's assertion that the language "all applications for Patent and all Patents therefor" is indicative of more than the United States patent application, Dr. Tryon claims the language in the Assignment "specifically relate[s] to Divisional, Continuation, or Continuation in Part applications from the original U.S. Patent application. There is no support that this language in the assignment refers to foreign patents." Document No. 53 at 12 (citation omitted). Third, the post-June 3, 2003 minutes should not be considered because the parties do not agree these minutes include terms of the assignment. Moreover Dr. Tryon argues those minutes should not be considered by the Court.

> [N]one of these minutes are admissible evidence because AgriNova has not included any affidavits or other supporting documents to support the authenticity of these minutes. Further, they cannot be parol evidence because the minutes came *after* the agreement was signed, and . . . AgriNova has offered no legal

reason why the Court should look to *any* parol evidence to interpret the assignment.

*Id.* at 13.

Finally Dr. Tryon points to an inconsistency in AgriNova's position. AgriNova claims, in the March 6, 2003 Assignment, Dr. Tryon and Jerman Stein transferred the rights to all foreign patents and patent applications in addition to the United States patent application. AgriNova further contends, at a post-June 3, 2003 meeting, Dr. Tryon stated he would execute an assignment of the South American patents to AgriNova. "[I]f the original assignment had included rights to the foreign patents, then a subsequent assignment would not have been necessary." *Id.* at 14.

The parties' disagreement regarding whether the March 6, 2003 Assignment included or excluded the rights to all foreign patent applications and issued patents is a contractual dispute which does not implicate any rights under the patent itself. Under Maryland law the interpretation of a written contract is generally a question of law resolved by the court. *Mercantile-Safe Deposit & Trust Co. v. Delp & Chapel Concrete & Constr. Co.*, 44 Md. App. 34, 41, 408 A.2d 1043, 1048 (1979). Maryland follows the principle of the objective interpretation of contracts. "If the language of a contract is unambiguous, [the court] give[s] effect to its plain meaning and do[es] not contemplate what the parties may have subjectively intended by certain terms at the time of formation." *Cochran v. Norkunas*, 398 Md. 1, 16, 919 A.2d 700, 709 (2007). In other words, a court looks to the four corners of the contract. This objective interpretation of contracts principle is applied as follows:

A court construing an agreement under [the objective theory] must first determine from the language of the agreement itself what a reasonable person in the position of the parties would

> have meant at the time it was effectuated.  In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed.  In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.

*Id.* at 17, 919 A.2d at 710 (quoting *General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)).  Further, in construing a contract under Maryland law, a court must construe the agreement in its entirety.

In reviewing the Assignment of March 6, 2003 from Dr. Tryon and Jerman Stein to AgriNova, the Court finds Dr. Tryon and Jerman Stein conveyed to AgriNova "the full and exclusive right, title and interest" in "an application for Patent of the United States filed May 30, 2002 as U.S. Serial Number 10/158,605."  That application concerned improvements in "APPARATUS AND METHODS FOR CONTROLLING CRAWLING INSECTS IN BUILDINGS AND AGRICULTURAL USES."  The Assignment makes five specific references to the *United States* or *U.S.*:  (a) "set forth in an application for Patent of the United States," (b) identifying the U.S. patent serial number, (c) "the full and exclusive right, title and interest in the United States of America to said application," (d) "to all Letters Patents in the United States" and (e) "in connection with said application for Patent, or any proceeding in connection with Patent in the United States[.]"  It is clear, from reviewing the contract, that the Assignment by Dr. Tryon and Jerman Stein to AgriNova was specifically limited to the patent application (and any related continuations, reissues or extensions of said application or patent) identified as U.S. Serial Number 10/158,605.  There are *no* references to foreign patents or patent applications in this Assignment.

The Court notes however, from the face of this Assignment, that *not* all terms of the agreement are embodied in the Assignment. The phrase —"in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration[]" — indicates Dr. Tryon and Jerman Stein received other consideration for the Assignment which is not stated.

> Q:    So part of the initial negotiations in the formation of this company, you wanted recognition you would be repaid for the amount of money you invested out of your pocket over those eight years, and you got a promissory note for that?

> A:    Yes.

> Q:    And same with Mr. Stein; he got a promissory note, correct?

> A:    Yeah.

> Q:    Is there a piece of paper in existence that you know of leading up to the formation of AgriNova which sets out the understanding of what you all were doing together other than the articles of incorporation and the organizational meeting? Do you know of any other memos, anything?

> A:    Well, there was [sic] a number of board minutes that I used to rely on, but other than the initial document, no.

> Q:    So it's fair to say when you went back to look for all your documents, you don't have any e-mails other than the ones you produced – – I'm not trying to play a game with you – – that reflect anything as to an agreement reached between you and Mr. Stein about his interests. There's no backup in writing for that.

> A:    No.

> Q:    There is no backup other than the board minutes and what you have produced as to any agreement as to what you were to receive over and above your 500 shares of stock.

> A:    True.

Pl.'s Br., Ex. 2 (Tryon Dep. 51:9 – 52:19).  Julian Heron testified that the agreement between

AgriNova and Dr. Tryon and Jerman Stein is not found in one document.

> Q:     Am I right that there is no single document containing all
> the terms of the agreement between Tryon and the company?
>
> A:     I believe that's correct.

*Id.*, Ex. 11 (Heron Dep. 51:9 - 12).  In addition to the March 6, 2003 Assignment, additional

terms are embodied in the March 6, 2003 and June 3, 2003 minutes.

The March 6, 2003 minutes refer to a patent application for "Apparatus and Methods

for Controlling Crawling Insects in Building[s] and Agricultural Uses" identified in the

Assignment of March 6, 2003.  The minutes suggest a *singular* patent application only.  The

Court notes however that these minutes indicate Dr. Tryon and Jerman Stein assigned and

AgriNova accepted transfer of *the invention and patent application*.  It is the Court's

understanding that the dispute between Dr. Tryon and AgriNova involves a *single* invention, the

insect repelling plastic film later dubbed *Flora-Film*.

The June 3, 2003 minutes indicate there is more than one patent.

> A report was given as to the status of **various** pending and issued
> patent**s**.  The transfer of the pending application for the U.S.
> patent has been accomplished.  Counsel has been asked to
> transfer the issued patent**s** to AgriNova.

Opp'n, Ex. F3 at 1 (emphasis added).  Both Dr. Tryon and Jerman Stein attended this special

meeting.  Jerman Stein arrived late and specifically arrived *after* the report on the status of

various pending and issued patents was given.

In his reply Dr. Tryon asserts,

> that the terms of the assignment were agreed to in the
> assignment document as well as the Board of Directors minutes of

> March 6 and June [3], 2003, *none of which* indicate assignment of any foreign patent rights from Dr. Tryon and Mr. Stein to AgriNova. Also, the Meeting Minutes which discuss the arrangement between Dr. Tryon and AgriNova refer to a patent in the singular.

Document No. 53 at 11 (citations omitted). Although the June 3, 2003 minutes do not specifically refer to the assignment of rights of foreign patents, the minutes make reference to patents in the *plural*. The Assignment of March 6, 2003 refers to the U.S. patent application *only*. The June 3, 2003 minutes, which Dr. Tryon acknowledges include terms of the assignment, refer to *issued patents*, a phrase distinguishable from *patent application*. Dr. Tryon was in attendance at the Board meeting when the report was given on the status of various pending and issued patents. If the Board of Directors discussed other patents and specifically foreign patents that Dr. Tryon and Jerman Stein owned but had not assigned to AgriNova, presumably, Dr. Tryon would question or challenge that report during the Board's meeting.

Because there is ambiguity about the words used in the June 3, 2003 minutes, it is appropriate for this Court to consider external documents.

> Where the meaning of a contract is uncertain and ambiguous, parol evidence is admissible to demonstrate the situation of the parties, the surrounding circumstances when the contract was made, and the construction that the parties give to the contract, either contemporaneously or subsequently. Where the parol evidence is not in conflict, the court must construe the contract. Where, however, there is a conflict on a material point necessary to interpret the contract, the meaning of the contract is a matter for the jury.

*Barber v. Eastern Karting Co.*, 108 Md. App. 659, 678, 673 A.2d 744, 754 (1996) (citations omitted).

On April 25, 2003 Dr. Tryon sent an e-mail to Jerman Stein, Julian Heron, Peter Tutini and Dave Juday.  The first sentence of the e-mail states,

> Jerman has informed me that the Patent is now final in the following South American countries . . .
> …. Brazil, …. Peru, …. Mexico, …. Chile, …. Argentina, …. Ecuador.

Opp'n, Ex. A (E-mail from Tryon to Stein, et al. of 4/25/03).

Julian Heron was aware that the March 6, 2003 Assignment signed by Dr. Tryon and Jerman Stein concerned the U.S. patent application only.  In an e-mail to Peter Tutini, Julian Heron wrote in pertinent part,

> This is to let you know that the Assignment of the patent by Jerman Stein and Earl Tryon has been filed with the U.S. Patent and Trademark Office for recordation.
>
> This Assignment applies only to the U.S. patent application.  It has no effect outside our country.  We should ask the foreign associates who secured the patents received in the six Central and South American countries to send us the appropriate Power of Attorney and Assignment forms to transfer those patents to AgriNova Corporation.

*Id.*, Ex. B (E-mail of 5/6/03 from Heron to Tutini).  A courtesy copy of this e-mail was sent to Jerman Stein, Dr. Tryon and Dave Juday.  *Id.*  Dr. Tryon has not submitted as evidence in support of his motion for summary judgment his e-mail response (or the e-mail response from Jerman Stein) objecting to or contesting Julian Heron's presumption that the foreign issued patents should be transferred to AgriNova.

In the August 8, 2003 minutes it was reported that "the patent counsel has not responded to the request to transfer the Central and South American patents to AgriNova.  Mr. Peter Tutini indicated that he would be in touch with counsel to determine the status."  *Id.*, Ex. F4 at 1.  Dr. Tryon participated in this meeting by telephone.  Jerman Stein was absent.

In the April 7, 2004 minutes it was reported that

> George Loud, Esq. reviewed the status of the pending patent application in the United States. He reviewed the claims currently being made and claims that could be made in the future. He indicated that the likelihood of obtaining a patent on our product in the United States was good. He suggested we carefully review whether or not we wish to pursue patents in other countries because of the cost of obtaining them.

*Id.*, Ex. F6 at 2. Jerman Stein attended this meeting. Dr. Tryon participated by telephone.

In the June 2, 2004 minutes there is a specific reference to the assignment of foreign patents.

> A discussion was held concerning the assignment of all the Central and South American patent rights to AgriNova Corporation. *Dr. Earl Tryon indicated that he was prepared to sign the assignment as soon as patent counsel had it ready to sign. He indicated that this was the agreement he and Mr. Jerman Stein had agreed to originally*. He indicated that both had received payment for all of their patent rights in the form of corporate notes and stock. It was assumed that Mr. Jerman Stein would do the same due to his position as a Director, Shareholder, and Note Holder.

*Id.*, Ex. F7 at 3 (emphasis added). Dr. Tryon attended this meeting. Jerman Stein was absent.

Others, specifically attorneys, were confused about the assignment of the foreign patents. On October 17, 2005 Pat Givens, on behalf of George A. Loud, Esquire (patent counsel for AgriNova) sent an e-mail to Laura Lombardi of Clarke Modet & Company in Argentina.

> Responsive to your below e-mail, Mr. Jerman []Stein has assigned his rights to the captioned Brazilian application and corresponding applications in other countries to Agrinova Corporation and has thereby relinquished control.

> We represent Agrinova and, accordingly, you should communicate only with this firm.

> We will only honor those invoices [] for work in accordance with our instructions.

33

If necessary, we will have an officer of Agrinova write you directly to confirm the foregoing.

Pl.'s Br., Ex. 16 at 3-4 (E-mail from Givens to Lombardi of 10/17/05).

Almost two years later, on September 13, 2007, George Loud sent the following e-mail to Laura Lombardi,

I represent Agrinova.  My understanding is that Jerman Stein and Earl Tryon are on the Board of Directors of Agrinova, but I do not represent either Mr. Stein or Mr. Tryon as individuals.  My understanding of the relevant facts is that Mr. Stein and Mr. Tryon have accepted payment from Agrinova for all rights to their patents and applications in South America, which makes Agrinova the owner of the captioned patent in Argentina as well as the other patent and applications in South America.  Indeed, Agrinova has paid all annuities and other costs associated with the South American patents and applications.

Id., Ex. 16 at 2 (E-mail from Loud, Esq. to Lombardi of 9/13/07).  Mr. Loud sent a courtesy copy of this e-mail to Julian Heron and Don Hill, former patent counsel for Dr. Tryon and Jerman Stein.  Don Hill, in turn, sent the following e-mail to Ms. Lombardi.

As you may know, Alston & Bird LLP represented Mr. Stein and Dr. Tryon in connection with the U.S. patent application and its foreign counterparts, until Agrinova entered the picture.  Based on my recollection of what occurred at that time, we were instructed that all files of Mr. Stein and Dr. Tryon were to be transferred to George Loud on behalf of Agrinova, and we initiated the file transfer and sent the files to Mr. Loud.  However, very shortly after that, we learned that only the U.S. rights of Mr. Stein and Dr. Tryon had been assigned to Agrinova (per the Assignment document that Mr. Stein has sent to you).  Accordingly, we contacted Mr. Loud again and told him that there was an issue as to whether the foreign files should have been transferred, and we requested that he return the foreign files to Alston & Bird until the issue was resolved.  Mr. Loud never returned the files to us.

> Subsequently, I learned that Agrinova has been claiming to own the rights to the invention worldwide. However, the only assignment or transfer document I am aware of is the Assignment that you have a copy of, which clearly assigned <u>only the U.S. rights.</u> Accordingly, as far as I know, the foreign rights were never assigned or transferred to Agrinova.
>
> I hope this is helpful in resolving the situation.

*Id.*, Ex. 16 at 1-2 (E-mail from Hill, Esq. to Lombardi on undisclosed date[5]).

On September 13, 2007 Jerman Stein sent the following e-mail to Mr. Loud, Ms. Givens, Mr. Hill, Dr. Tryon and two other recipients.

> Mr. George A. Loud,
>
> Is time you understand this, we did not sign an agreement for the foreign patents or anything else, just for the USA territory, it[']s it period!!
>
> We did not receive[] any compensation or moneys for signing or anything else, not then, not yet. Like you mention in email to Ms. Lombardi on Sept. 13, 2007, that is untrue.
>
> You have no right to take our information and do as you please, you[r] rights are within the USA territory only.
>
> Please do as requested previously, now.
>
> Return all items with regard to foreign patents.

*Id.*, Ex. 16 at 1 (E-mail from Stein to Loud, Esq., et al. of 9/13/07) (all capital letters removed).

Jerman Stein "signed" the e-mail on behalf of himself and Dr. Tryon.

On December 11, 2007 Dr. Tryon sent the following e-mail to Dave Juday with a courtesy copy sent to Julian Heron, stating in pertinent part,

---

[5]   The Court presumes Mr. Hill sent the e-mail on September 13, 2007, because the same day Mr. Loud sent the e-mail to Lombardi, Jerman Stein sent an e-mail to Mr. Loud which included the undated e-mail from Mr. Hill to Ms. Lombardi.

Sorry for the delay in not responding to your E-mail with the new Assignment. I have given this a great deal of thought and have decided not to sign this new Assignment until we have a mutually favorable financial arrangement that would give me a reason to sign.

Over the last 4-5 years I have spent a great deal of time and money, and put my credibility on the line with important researchers and regulatory professionals. During this time I have never seen a money timeline that gives me any hope of making our plastic film a successful marketable product in the United States. This film is my life … and I need a "real" financial timeline that gives me hope we can protect the future of this special plastic film.

Any investor I find I will bring to AgriNova. If I get an SBA loan, which I am working on now, I will bring this investor to AgriNova. But to date, AgriNova has given me no financial reason to give additional rights to AgriNova.

*Id.*, Ex. 27 (E-mail from Tryon to Juday of 12/11/07).

Peter Tutini, the first President and CEO of AgriNova, understood that Dr. Tryon and Jerman Stein assigned not only the U.S. patent application but also all foreign patents and patent applications.

Q:      You said that Earl and Jerman were putting a patent in or patents?

        *                    *                    *

        THE WITNESS:  Yes.

Q:      What were they getting in exchange for that?  What was your understanding of what they were getting in exchange?

A:      They got shares.

Q:      What was your understanding of what they were putting into the company?

A:     Any and all patents.   I mean, there was a patent application in process here in the U.S.  Alton & Bird, I think, were the lawyers at the time.  I started paying down the debt that they had accrued with them.

They gave us the patent for Argentina, I believe.  We had that.  I don't know what's gone on in four years.  I have no idea.  The others were supposed to follow.   There were patent applications in most cases, and who knows when they would arrive, but we were paying them for it, the lawyers.  We were paying the lawyers for filing those patents and refiling, because I guess that was a regular thing.

Q:     So your understanding was that from the very beginning, they were putting in their rights to the U.S. patent and to the foreign applications or patents?

A:     Of course.

Q:     Did you – –

A:     I mean, that's why I made the trip down to Chile with them, with Jerman.  It was all part of that.  Yes, of course, that was part of the deal.  We're in this together.  Your investment is the patents. Earl was putting in primarily technical expertise.  Presumably I was providing management expertise.  We're in it together.

*Id.*, Ex. 28 (Tutini Dep. 9:18-19, 10:2 – 11:13).

Julian Heron, AgriNova's first Secretary, has a similar recollection.

Q:     So, again, your understanding was that one of the things AgriNova was getting from Earl and Jerman was the rights to I think you said the invention?

A:     Correct.   That included any patent that was issued anywhere in the world and all the patent applications that were then pending worldwide.

Q:     So if you look at [the March 6, 2003 Board of Directors' Special Meeting minutes], there's references to patent in the singular.  This is sort of one of the main issues of the case.  I'm sure this is something that you discussed, but I'm trying to

reconcile your position that it involves all the patents and the invention versus what the document seems to say.

The question is, if your understanding was they were trying to convey all the patent rights, foreign and domestic – –

A:     My understanding is they did convey all the patents.

Q:     Why does this document just refer to patent in the singular?

A:     I can only say it was probably bad writing.

Q:     So what language would you point to in that document to communicate to somebody that all the patents had been conveyed?

A:     I would look at the whole document, but much more importantly in my mind is the fact that Dr. Tryon and Mr. Stein, who were sitting there, whom I could see and whom I could hear, clearly indicated that they were transferring all their invention and the pending patent applications, and if there was a patent, it would have only been the one in Argentina, and that would have come, too, and it was specifically the Argentine patent, which was the first one issued anyplace in the world, that Dr. Tryon always referred to as AgriNova's patent.

*Id.*, Ex. 11 (Heron Dep. 14:6 – 15:22).

As demonstrated above there is a conflict on a material point necessary to interpret the contract, namely, whether Dr. Tryon and Jerman Stein assigned the U.S. patent application *only* to AgriNova or whether they assigned *all* patents and patent applications, foreign and domestic, to AgriNova.   Because of this genuine issue as to a material fact, Dr. Tryon is not entitled to judgment as a matter of law as to Count I, Declaratory Judgment.

C.     *Count II:  Tortious Interference with Business Relations*

Dr. Tryon argues he is entitled to summary judgment on this count because AgriNova interfered with Dr. Tryon "developing his invention and product outside the United States,

pursuant to his ownership of foreign patents and patent applications."  Pl.'s Br. at 18.  As outlined in excruciating detail *supra*, there is a genuine issue as to a material fact (whether Dr. Tryon and Jerman Stein assigned to AgriNova their title, rights and interests in all foreign patents and patent applications).  Thus, Dr. Tryon is not entitled to judgment as a matter of law as to Count II, Tortious Interference with Business Relations.

> D.      *Counterclaim I:  Tortious Interference with Prospective Business Advantage*

In its Counterclaim AgriNova alleges, having assigned the rights to the invention to AgriNova and knowing the corporation relied on that assignment of rights to solicit capital and to develop, market and distribute the invention, Dr. Tryon and Jerman Stein "represented to other potential investors and possible customers that the rights to the Invention had not been assigned and the Company had no right to represent that to potential investors that it had the rights to the Invention."  Countercl. ¶ 18.  Dr. Tryon asserts he is entitled to summary judgment on this counterclaim because AgriNova had no rights to the foreign patents and patent applications and thus AgriNova wrongfully informed investors and potential investors that it had such rights.  As outlined in excruciating detail in *Section B supra*, there is a genuine issue as to a material fact (whether Dr. Tryon and Jerman Stein assigned to AgriNova their title, rights and interests in all foreign patents and patent applications).  Thus, Dr. Tryon is not entitled to judgment as a matter of law as to Counterclaim I, Tortious Interference with Prospective Business Advantage.

> E.      *Counterclaim II:  Breach of Fiduciary Duty*

In its Counterclaim, regarding a breach of fiduciary duty, AgriNova alleges in pertinent part,

As members of the board of directors of the company, [Dr. Tryon and Jerman Stein] occupied a fiduciary relationship with the company that required them as directors to perform their duties in good faith and in a manner that is in the best interest of the company and to act with the care of an ordinary prudent person acting as a director.

[Dr. Tryon and Jerman Stein] violated their fiduciary duty to the company by telling potential investors and potential customers of the Invention that the company did not own the rights to develop, market, sell and distribute the Invention.

Countercl. ¶¶ 23-24.

Dr. Tryon contends his actions are protected by the business judgment rule and that AgriNova cannot show that he acted in bad faith with regard to his duties to the corporation. Further Dr. Tryon asserts AgriNova did not have rights to any foreign patent application or patent. Dr. Tryon thus claims he is entitled to summary judgment on this counterclaim.

It is undisputed that Dr. Tryon had multiple conversations with a prospective investor, Joe Simpson. It is further undisputed that Dr. Tryon formed his own company, Innovative Insect Management Systems ("IIMS") to develop and market an agricultural plastic film for use in South America. Dr. Tryon formed this company before giving a presentation about the plastic insect repelling film at an SBA conference. *See* Pl.'s Br., Ex. 2 (Tryon Dep. 89:19 – 91:11), Ex. 20. During his deposition Dr. Tryon discussed how he first met Joe Simpson and the relationship he cultivated.

Q:     There came a time when you tried to introduce a man by the name of Mr. Simpson to the board?

A:     Yeah.

Q:     When did you first meet Mr. Simpson?

A:      I guess about a little bit of time after my SBA presentation and then – –

Q:      Can you give me a time frame?

A:      I'm trying to.  Probably 2006.  I'm guessing.  I can't remember.  It's been a while.

*                              *                              *

Q:      In what context did you meet Mr. Simpson?

A:      He had heard through somebody at SBA about my product and had contacted an intermediary who put him in touch with me.

Q:      Did you meet with him?

A:      Oh, I think we spent six months e-mailing and then we did have a meeting.

Q:      When was the first time you saw him face to face?

A:      Probably 2007, early.  I'm guessing now.  It could be six months either way.

Q:      What did you tell him that you were?

A:      IIMS.  I don't even know the company anymore.  IIMS.

*                              *                              *

Q:      You sat down with him, and what was the purpose of the meeting?

A:      To try to find a true potential investor for AgriNova.

Q:      You were still an owner and a board of director member of AgriNova.

A:      True.

Q:      So you met him in your capacity as an owner of a company different from AgriNova.

A:     I sat down with him as somebody with an idea.  That's what we discussed.  We never discussed who owned what company, what company did what.  This was Earl trying with an incredible plastic product that would match well with the product he was making, and I wanted to determine, since I had seen a thousand failures, if this gentleman was a genuine investor that had real money or was this a bunch of bullshit, period.

Q:     But you represented to him you owned the rights.

A:     I represented to him that I owned the rights in South America.

Q:      So the purpose of the meeting with Mr. Simpson was South American marketing?

A:     Initially, so that I could keep it simple[.]

Pl.'s Br., Ex. 2 (Tryon Dep. 95:12 - 21, 96:1 - 15, 18 - 97:22).

Consistent with his deposition testimony Dr. Tryon had a number of e-mail exchanges with Joe Simpson.  *See* Opp'n, Ex. H.  On September 25, 2007 Dr. Tryon sent an e-mail entitled "Earl has an investor for AgriNova" to Julian Heron and Dave Juday with a courtesy copy to Joe Simpson.  The e-mail stated in relevant part,

I have finally found an investor who expressed an interest in the manufacturing and distribution of our plastic in South America. Over the past few months Jerman and I decided that his interest was sincere enough to invite him in to talk with as many of the principals of AgriNova as possible.

\*                          \*                          \*

Jerman and I are serious about the importance of your meeting with Joe.  This investor has another patented product that packages nicely with our plastic that repels insects and he is in the process of taking his 11 year old company public … so please find time on Sunday to meet with Joe Simpson.

Pl.'s Br., Ex. 23 (E-mail from Tryon to Heron, et al. of 9/25/07).

On September 28, 2007 Dr. Tryon responded to questions from Dave Juday.

> Finally back in my office.  Answer to your recently sent question recently [sic] in [italics] type below.
>
> Thanks.  I understand about the confidentiality agreement which is pretty standard.  So that is fair enough.
>
> But question 1 is about you and Jerman.  Why are you guys sending him to AgriNova when you have your own business in South America?  *As owners in AgriNova we thought at some point it would be good for AgriNova to meet him*.
>
> *In earlier meetings Joe had asked us about the US market and when we informed him we had signed off on the US patents.  Joe then asked us to introduce him to the owners of the US patents at some point in the future.  Joe passing through Washington seemed a good time for the introduction.  Anytime you can set up a meeting would benefit AgriNova!!!*
>
> According to you guys (which we dispute) AgriNova has nothing to sell him in South America.  Please understand I am not trying to rekindle an argument, I am trying to understand what the expectations are.  You[,] Jerman both have asked via e-mail the price of buying the US patent back – is this about that, or are you suggesting he put money into AgriNova?  *Joe is a real investor .. I promise!  How he wants to invest in AgriNova is unclear to me …And this is an issue AgriNova and he/Joe should work out.  This is not a waste of your time.  This guy Joe, has access to money and knows business!!!!!!*

*Id.*, Ex. 24 (E-mail from Tryon to Juday of 9/28/07).

On October 4, 2007 Joe Simpson sent the following e-mail to Jerman Stein and Dr. Tryon.

> Earl, an excellent report of progress.   Now it is even more important that you and Jerman remove any "clouds" that still exist between their interpretation and your understanding of who controls SA[6] and the use of your invention there and equally as important, elsewhere.  Once we have a clear path for investment,

---

[6]  South America.

then and only then[,] can we further discuss how we want to proceed. Let's get moving on this before the window of opportunity is closed. Joe.

*Id.*, Ex. 25 at 1 (E-mail from Simpson to Stein, et al. of 10/04/07).

On March 17, 2008 Dave Juday sent the following e-mail to Joe Simpson with a courtesy copy sent to Jerman Stein and Dr. Tryon.

I would note that Messrs Stein and Tryon are major stock holders and members of the board of directors of AgriNova. All actions, books, meetings, contracts, etc are not only completely open to them as such, it falls within their responsibility to participate in them. If there are things that have not been communicated I believe it is clear where the burden falls.

I was shocked that Mr. Stein claimed in a message to Ambassador Johnson that AgriNova could not manufacture[] FloraFilm under its US patent and trademark and then export it [to] Guatemala. That is an outrageous claim.

I was doubly shocked that Mr. Tryon's name was signed to the message, as Tryon and Johnson had a lengthy conversation some time ago, … including in detail Guatemala. Also, Johnson's own staff at the expense of Allen F Johnson Assoc, namely former EPA official Richard White, had many conversations with Mr. Tryon about the registration application.

*Moreover, Mr. Tryon actually sent Mr. [sic] a CD which has his own voice recorded on it listing the foreign patents applications owned by AgriNova. You are in receipt of that CD, Joe*.

As we discussed on Friday the only way to move forward is to have complete disclosure on what Stein and Tryon have on their books outside of AgriNova. And that means both of them jointly and individually. Of course, AgriNova's books remain open.

We now have counsel reviewing the disputed assets. Pending some feedback from them, I will propose a path forward with you and Stein and Tryon. As long as the assets are disputed as they currently are, FloraFilm and the Stein/Tryon product remain virtually worthless to you, as you cannot get clear title of either.

Options seem highly limited at this point, and I am becoming more pessimistic as the days go by that I can meet what your demands will necessitate, and satisfy my fiduciary responsibility given the claims on certain assets made by Messrs Stein and Tryon.

I am willing to give it a shot, but I don't have much to work with. I will try to set up a communication with Messrs Stein and Tryon in the coming weeks.

*Id.*, Ex. 25 at 2 (E-mail from Juday to Simpson et al. of 3/17/08)(emphasis added).

The e-mails quoted above are consistent *and* inconsistent with Dr. Tryon's deposition testimony. At times it appears he is working on behalf of AgriNova and at other times for his and Jerman Stein's venture. Added to this confusion is the state of the foreign patent applications and patents — are they assigned to AgriNova or did Dr. Tryon and Jerman Stein retain their title, rights and interests? The lines are blurry and too many questions remain unanswered. For these reasons, the Court finds there is a genuine issue as to a material fact and Dr. Tryon is not entitled to summary judgment on Counterclaim II.

F. *Counterclaim III: Specific Performance*

In Count III of its Counterclaim AgriNova alleges in pertinent part,

[Dr. Tryon and Jerman Stein] agreed to assign their right, title and interest in the Invention to the company and in reliance thereon the company was formed and investors were solicited who invested capital in the company on the basis of the representation that the company was the assignee to the rights to the Invention.

[AgriNova] has requested that [Dr. Tryon and Jerman Stein] confirm in writing the assign[ment] of their interest as agreed and they have refused to do so.

Countercl. ¶¶ 27-28.

This counterclaim revolves around the disputed issue:  who holds title to the foreign patent applications and patents, Dr. Tryon and Jerman Stein or AgriNova?  As outlined in excruciating detail in *Section B supra*, there is a genuine issue as to a material fact.  Thus, Dr. Tryon is not entitled to judgment as a matter of law as to Counterclaim III, Specific Performance.

G.      *Amended Complaint Counts IV & V: Rescission & Material Breaches of Agreement*

In the Amended Complaint Dr. Tryon and Jerman Stein assert in support of Counts IV and V,

> Any alleged agreement between Plaintiffs and Defendant has been breached by Defendant in a variety of ways, including, Defendant failing to pay the required consideration in exchange for the alleged assignments, failing to implement marketing and distribution plans, failing to provide the necessary capital to carry into effect Defendant's marketing and distribution plans and failing to take other action to commercialize Plaintiffs' invention.
>
> In addition to continuing to seek the relief requested in their original Complaint, Plaintiffs also hereby seek rescission of any and all alleged agreements through which Defendant claims to have obtained an assignment of any foreign or domestic patent or patent application.
>
> Prior to filing this Amended Complaint, Plaintiffs offered to return to Defendant whatever consideration Defendant claims to have given to either Plaintiff in exchange for the claimed assignment of any patent or patent application, foreign or domestic.
>
> Defendant's breaches of any and all agreements between it and Plaintiffs are material and substantial and tend to defeat the object of any agreement between the parties making rescission an appropriate remedy.

Am. Compl. ¶¶ 43 – 46.

Rescission is an equitable relief under Maryland law. When a party to a contract discovers he has been defrauded, he has the right (a) to rescind the contract or (b) to retain the contract and collect damages for the breach, not both. *Merritt v. Craig*, 130 Md. App. 350, 365, 746 A.2d 923, 931 (2000). In seeking rescission a plaintiff must demonstrate he moved promptly after discovering the fraud or he will waive the right to rescind. *Id.* at 365-66, 746 A.2d at 931.

Dr. Tryon seeks to rescind the agreement with AgriNova for alleged material breaches and material misrepresentations. As outlined in *Section B supra*, the terms of the agreement between Dr. Tryon (and Jerman Stein) and AgriNova are unclear. Thus, whether the alleged material breaches and material misrepresentations occurred entitling Dr. Tryon to the equitable relief of rescission cannot be resolved *until* the question — what were the terms of the agreement between Dr. Tryon (and Jerman Stein) and AgriNova regarding the assignment of domestic and/or foreign patent(s) and patent application(s)? — is answered. Therefore, Dr. Tryon is not entitled to judgment as a matter of law as to Counts IV and V, Rescission and Material Breaches of Agreement, of the Amended Complaint.

## **CONCLUSION**

For the foregoing reasons, the Court finds there are genuine issues as to material fact and thus Dr. Tryon is not entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An Order will be entered separately denying Dr. Tryon's motion for summary judgment.


 January 31, 2011                                            /s/
          Date                                       WILLIAM CONNELLY
                                            UNITED STATES MAGISTRATE JUDGE